UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ADAM KORNGOLD, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:22-CV-10864-AK |
| DRB SYSTEMS, LLC, JAMES DANIEL PITTMAN, AND KENNETH BUNNEY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

**A. KELLEY, D.J.**

Plaintiff Adam Korngold ("Korngold") has moved to dismiss Counts III, IV, V, VI, VII, VIII, and IX of Defendant DRB Systems, LLC's ("DRB") counter-claims. [Dkt. 21]. DRB alleges that Korngold fraudulently concealed material information about Washify Services, LLC ("Washify") prior to its acquisition by DRB. DRB alleges that Korngold's concealment induced it to enter into an Equity Purchase Agreement (the "EPA") and caused it to overpay for Washify. Korngold has moved to dismiss DRB's claims for breach of the EPA (Counts III and IV), fraudulent misrepresentation and concealment (Counts V, VI, and VII), violation of Mass. Gen. Laws Chapter 93A (Count VIII), and violation of Mass. Gen. Laws ch. 110A, § 410 (Count IX). [Dkt. 16 at ¶¶ 54-113].

For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Counts III and IV and **DENIED** as to V-IX.

1

I.  BACKGROUND

Many of the details at the heart of this dispute the Court previously provided in its order resolving DRB's motion to dismiss.  [Dkt. 30].  The following additional facts are derived from DRB's answer and counterclaim.  [Dkt. 16].

Korngold owned Washify until it was acquired by DRB, which provides software and hardware to the car wash industry, on March 19, 2021.  [Id. at ¶¶ 1, 3].  Washify provides car wash point-of-sale and marketing systems that enable car wash owners to automate and scale their business.  [Id. at ¶ 4].

Prior to its acquisition by DRB, Washify sold Pay Stations to customers for outdoor use despite the fact that Korngold knew that the Pay Stations were only certified for indoor use. [Id. at ¶¶ 5-15].  Washify began selling its xStation Paystation kiosks (the "Pay Stations"), which it imported from its supplier in China, around 2019.  [Id. at ¶ 5].  These Pay Stations, in 2019 and 2020, were sold to car-wash customers for outdoor use despite not being tested or certified for such use by any Nationally Recognized Testing Laboratory ("NRTL").  [Id. at ¶ 7].  In 2020, a customer notified Washify that its electrician refused to install a Pay Station because it did not have an NRTL label.  [Id. at ¶ 8].  Washify then began to engage with its Chinese supplier to have the Pay Stations tested and certified or approval for outdoor use.  [Id. at ¶ 9].  Korngold was Washify's contact person while it engaged with the testing process with Intertek Testing Services.  [Id. at ¶ 10].  On November 16, 2020, Intertek issued a report that stated that the Pay Stations were only certified for indoor use and would need additional retrofitting before Washify could sell them for outdoor use.  [Id. at ¶¶ 11-12].  Korngold was notified on several other occasions by his employees and by the supplier that the Pay Stations needed to be redesigned to obtain outdoor certification if Washify wanted to continue selling them for outdoor use.  [Id. at ¶

2

13]. DRB alleges that Korngold, rather than making those changes, moved forward with indoor certification only and continued selling the Pay Stations to customers for outdoor use. [Id. at ¶ 14]. DRB further alleges that Korngold was aware that Washify's customers were purchasing the Pay Stations for outdoor use, that Washify was falsely marketing them for such use, and that the Pay Stations featured misleading labels that made it appear as if they were appropriate for outdoor use. [Id. at ¶ 15].

DRB also alleges that Korngold purposefully underreported import duties. [Id. at ¶¶ 16-19]. It claims that Korngold, as Washify's owner, must have been aware of the prices that they were paying to purchase its Pay Stations from its Chinese supplier, and the import duties those prices entailed. [Id. at ¶¶ 16-17]. The average price per unit paid for the Pay Stations varied from year to year, from around $4,510 in 2019 to $5,827 in 2021. [Id. at ¶ 17]. Despite this, Korngold directed its Chinese supplier to issue commercial invoices, from the periods of December 2018 to November 2021, that represented the sale price of the Pay Stations as $1,500 in order to avoid paying import duties. [Id. at ¶¶ 18-19]. DRB claims this avoidance resulted in them being forced to pay significant back taxes. [Id. at ¶ 19].

DRB claims that Korngold never disclosed the issues regarding outdoor certification and unpaid import duties, despite being obliged to do so. [Id. at ¶¶ 20-25]. On or around January 28, 2021, DRB and Korngold began their negotiations over the terms and conditions of the Washify acquisition. [Id. at ¶ 20]. The purchase was finalized on March 19, 2021, pursuant to the terms and conditions of the EPA. [Id. at ¶ 21]. In the EPA, in Section 3.06, Korngold expressly represented and warranted to DRB that Washify had no outstanding indebtedness and was not a guarantor for any liability of any other person. [Id. at ¶ 22; Dkt. 22 at Ex. A ("EPA") at § 3.06]. In Section 3.13(a) of the EPA, Korngold represented and warranted that Washify was in

3

compliance with all laws, and DRB relied on that assertion in assessing the value of its purchase of Washify. [Dkt. 16 at ¶ 23; EPA at § 3.13].

Also included in the EPA was a section governing how disputes between the parties, including for omissions and misrepresentations, would be resolved. [EPA at § 7]. That section stated that indemnification was the sole and exclusive remedy for most disputes and outlined the process through which a party could make a claim for indemnification. [Id.]. Part of the indemnification clause stated as follows:

> **Section 7.09 Indemnity as Sole Recourse.** Subject to Section 2.03(b) and Section 2.03(c), the parties hereto acknowledge and agree that, from and after the Closing, their **sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions** set forth in this ARTICLE VII. In furtherance of the foregoing, **each party hereto hereby waives, to the fullest extent permitted under any Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other party hereto and its Affiliates and each of their respective Representatives arising under or based upon any Law**, except pursuant to Section 2, the indemnification provisions set forth in Section 6.02 and this ARTICLE VII.

[Id. at §7.09] (emphasis added). This provision goes on to state that the exclusive indemnification provision it outlines does not apply to a party seeking to assert claims based on fraud. [Id.]. The indemnifications provisions referenced in the remainder of ARTICLE VII outline the process by which a buyer, like DRB, could remedy breach, including for "any breach or non-fulfillment" of the sellers commitments under the EPA. [EPA at §7.10]. One requirement of that process is that the party seeking indemnification must serve a written notice within 12 months of the closing date. [Id. at § 7.03]. While representations and warranties made

4

in the agreement, with the exception of any fraud, do not survive the closing date, all covenants and agreements the parties made do survive the closing date. [Id.].

Korngold did not disclose that the Pay Stations were not certified for outdoor use or that the import taxes on the Pay Stations had been underpaid for years. [Dkt. 16 at ¶ 24]. DRB asserts that, as a result of those omissions and its reliance on Korngold's representations, it significantly overvalued the price it was willing to pay for Washify and undervalued the expenses that it would incur from its purchase. [Id. at ¶ 25].

After the Washify acquisition, Korngold entered into an employment agreement with DRB and remained in his role as Washify's President. [Id. at ¶ 26]. Korngold agreed to be bound by DRB's policies which included provisions requiring honesty in business dealings and financial integrity. [Id. at ¶¶ 27-29]. The employment agreement included salary and a one-time retention bonus that Korngold was guaranteed unless he was terminated "for Cause." [Id. at ¶ 30-31].

After the Washify acquisition, DRB was able to more thoroughly review and commence an investigation into the company's practices. [Id. at ¶ 33]. DRB conducted an internal review in November 2021 and discovered that Washify, under Korngold's leadership and direction, had gotten its Chinese supplier to submit invoices understating the Pay Stations' value so that they could reduce import duty obligations. [Id. at ¶¶ 34-36]. At that same time, DRB also became aware that customers were having significant product failures and electrical issues because Washify was selling them for outdoor use even though Korngold was aware that they lacked the certification for doing so. [Id. at ¶ 37]. When Korngold was interviewed as part of the investigation, he admitted having underreported the import value for the Pay Stations and

acknowledged that he had attempted to have the Pay Stations certified for outdoor use before the Washify sale but failed in doing so. [Id. at ¶¶ 38, 40-41].

The investigation concluded that Korngold violated DRB's business ethics and financial integrity policies, that he misrepresented the Pay Stations' outdoor certification to customers, that he underpaid import duties and directed Washify employees to make those misrepresentations and underpayments, and that he had knowledge and involvement in those misrepresentations and underpayments. [Id. at ¶ 42]. As a result, he was terminated "for Cause" by DRB. [Id. at ¶ 43].

After Korngold's termination, DRB discovered that Washify misrepresented its ownership over certain intellectual property. [Id. at ¶ 45]. Specifically, Washify never owned the software known as GPIC which was used in its terminals, and never owned its tunnel controller, a piece of hardware that used software to manage cars going through a car wash. [Id. at ¶ 46]. Korngold, however, represented during the Washify acquisition that Washify owned and conveyed that intellectual property to DRB. [Id. at ¶ 45]. DRB became aware of the issue when a Washify customer contacted them about problems they were experiencing with the tunnel controller and GPIC software. [Id. at ¶ 46]. DRB realized it could not fix the issue quickly because it did not have access to the source code. [Id. at ¶ 47]. It later learned that the software was developed by a third-party software development group in India and that Washify never owned the source code for it in the first place. [Id. at ¶ 48].

DRB asserts that this revelation contradicted the guarantees Korngold made in the EPA. In particular, DRB points to Section 3.10(a)(F) whereby DRB purchased "material Company Software (including both source code and object code), systems, databases, and applications (except Off-the-Shelf Software Licenses)." [Id. at ¶ 50; EPA at § 3.10(a)]. That section further

6

stated that Washify "owns all rights, title and interest in and to all Company Owned Intellectual Property free and clear of any Encumbrances (other than Permitted Encumbrances)." [EPA at § 3.10(a)].

The EPA defines "Company Software" as "all Software (including, without limitation, computer software, middleware, software applications, databases, scripts, and web application components) licensed or otherwise offered by the Company or any of its Affiliates, licensed to the Company or any of its Affiliates, owned by the Company or any of its Affiliates, and used in the operation of the Business." [EPA at 4]. DRB asserts that Korngold made these representations despite knowing that Washify did not own the software and hardware in question. [Dkt. 16 at ¶ 52]. As a result, DRB now must enter into an agreement with the third-party developer to either purchase the software or to pay to obtain a license to use it. [Id. at ¶ 53].

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). Second, the Court must determine

whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559). In considering a motion to dismiss a counterclaim, the court applies the same standards as to a motion to dismiss a complaint. Lexington Luminance LLC v. Osram Sylvania Inc., 972 F. Supp. 2d 88, 91 (D. Mass. 2013).

### III. DISCUSSION

The Court may consider only facts and documents that are incorporated into the complaint or counterclaim; however, when the allegations are dependent upon a document, the authenticity of which is not challenged, that document "effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16–17 (1st Cir. 1998)). The EPA agreement, which DRB references and relies on, is such a document and the Court will rely upon it as it analyzes the sufficiency of DRB's claims.

The parties in their EPA agreement specified that while any dispute would be brought in Massachusetts, the Agreement was to be governed and construed in accordance with the law of the State of New York. [EPA at § 8.10(a)]. A choice of law clause in a contract is considered enforceable "absent a strong showing that it should be set aside." Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 292 (1st Cir. 2015) (quoting Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). Accordingly, New York law governs the understanding of and construction of the agreement.

8

**a. Fraudulent Misrepresentation Claims (Counts V, VI, VII)**

DRB asserts three separate counterclaims alleging fraud on the part of Korngold.  The first of these claims (Count V) focuses on representations made by Korngold to DRB that Washify had no outstanding import duty obligations and that the Pay Stations were certified for outdoor use.  [Dkt. 16 at ¶ 82].  The second claim (Count VI) is that Korngold made misrepresentations to DRB that it owned and could convey software, which in reality it had no licensing agreement to use, in order to induce the purchase of Washify and the employment that followed.  [Id. at ¶¶ 88-90].  The third (Count VII) asserts that Korngold knowingly concealed the fact that Washify had been underreporting import duties and had been selling Pay Stations for outdoor use despite them being only certified for indoor use.  [Id. at ¶ 94].  DRB claims that Korngold made these misrepresentations in order to mislead it into purchasing Washify, employing Korngold as Washify's President, and allowing Korngold to receive a bonus for that role—all in violation of Korngold's employment agreement and DRB policies which required him to act with honesty.  [Id. at ¶¶ 95-96].  As a result of all of these acts, DRB claims it has incurred significant monetary damages.  [Id. at ¶¶ 79-80, 86, 92].

Korngold first argues that DRB lacks the specificity needed to meet the heightened pleading standard for fraud.  [Dkt. 24 at 15-16].  In addition to meeting the general pleading requirements of Rule 12(b)(6), claims of fraud must be pled with particularity pursuant to Federal Rule of Civil Procedure 9(b).  The purpose of this heightened pleading requirement is to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery."  Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996).  The complaint must "specify[] the false statements and by whom

9

they were made" and "identify[] the basis for inferring scienter"; further, it must also set forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." North Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009) (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)). The pleading is expected to specify the "who, what, where, and when of the allegedly false or fraudulent representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

DRB's allegations identify the "who" as Korngold. DRB also identifies the "what" by specifying the specific misrepresentations and omissions which they assert constitute fraud. The first fraud claim (Count V), concerning Washify's import duty obligations and the Pay Stations being certified for outdoor use, is supported by the following factual allegations: Washify was on notice that its Pay Stations were ill-equipped for outdoor use because they were informed by a customer that the Pay Stations did not have the proper label for outdoor use in 2020; Korngold thereafter personally contacted their Chinese supplier on September 1, 2020 to try to get the Pay Stations certified for outdoor use; Korngold again was informed by the supplier that the Pay Stations were not intended for outdoor use; and Korngold knowingly continued to sell Pay Stations to customers for outdoor use regardless. [Dkt. 16 at ¶¶ 5-15, 82-86]. DRB also alleges that Korngold was involved in purchasing the Pay Stations from the Chinese supplier and that Korngold, from December 2018 through November 2021, knowingly directed that supplier to issue commercial invoices underrepresenting the sale price to avoid paying import taxes he would have owed. [Id. at ¶¶ 17-19].

DRB's assertion that Korngold failed to disclose those issues during the parties' negotiations, which commenced on January 28, 2021 and continued until March 19, 2021,

10

provides the requisite "where" and "when." [Id. at ¶¶ 20-25]. Specifically, DRB's counterclaim highlights Korngold's commitments in the EPA at Section 3.06 and Section 3.13(a) that Washify had no indebtedness and that it was in compliance with all laws as a knowingly false statement. [Id. at ¶¶ 22-25].

DRB's second fraudulent misrepresentation claim (Count VI) accuses Korngold of making false representations before, during, and after the Washify acquisition about Washify's ownership and ability to convey software and hardware that it did not own and had no licensing agreement to use. [Id. at ¶¶ 88-90]. DRB further explains that the inability to access this software and hardware imposed additional costs. [Id. at ¶¶ 46-50]. DRB contends that this discovery revealed that commitments made in various provisions of the EPA by Korngold regarding Washify's ownership of that property, at Section 3.10(a)(F) of the EPA, were knowingly false. [Id. at ¶¶ 50-53]. Those assertions supply the "where" and "when" in which the false statements were made.

DRB's claim for fraudulent concealment (Count VII) similarly survives because it reiterates all of the same allegations with the additional contention that Korngold knowingly concealed those facts with the intent to mislead DRB into acquiring Washify and employing Korngold. [Id. at ¶¶ 94-96].

The allegations contained in the complaint are of the type that satisfy the heightened pleading standard under 9(b). See, e.g., FERC v. Maxim Power Corp., 196 F. Supp. 3d 181, 198 (D. Mass. 2016) (holding 9(b) standard met where plaintiff provided factual allegations identifying misleading communications and material omissions and explained why those statements were misleading); Lycos, Inc. v. Internet Venture Works, Inc., CIV.A. 02-11383-RWZ, 2003 WL 21146661, at *2 (D. Mass. May 19, 2003) (plaintiff's allegation that defendant

committed to negotiating settlement in good faith but had no intention of doing so was sufficient to meet 9(b) because the allegations "put defendant on notice about the scope of the fraud claims with the requisite degree of precision" and requiring more "would place an undue burden on plaintiff to allege facts that are peculiarly within the defendant's control") (internal quotations omitted); Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 106 (D. Mass. 2014) (holding that plaintiff's fraud allegations, which identified statements made that artificially inflated a corporation's revenue, identified the speaker and the time and context in which those statements were made and gave reasons for why the statements were fraudulent, satisfied 9(b) standard); First Choice Armor & Equip., Inc. v. Toyobo Am., Inc., 717 F. Supp. 2d 156, 161-62 (D. Mass. 2010) (holding 9(b) standard met where supplier misrepresented the quality and condition of product it sold by listing examples of misrepresentations and fraudulent omissions on the part of defendant).

DRB's counterclaims highlight which statements they allege were false, in particular the commitments made in the EPA, and identify Korngold as the individual making the false statements. The pleadings identify the basis for inferring scienter because they set forth factual allegations that would establish that Korngold had knowledge about the issues with Washify's import taxes, outdoor certification, and software ownership but made contradictory commitments to DRB in the EPA anyway. DRB's pleadings also do not raise the concerns that underlie the heightened pleading standard under 9(b), as they make clear which facts and issues form the basis of the wrongdoing Korngold is accused of, placing him "on notice" and enabling him "to prepare meaningful responses." In re Lupron Mktg. and Sales Pracs. Litig., 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting New England Data Servs., Inc. v. Becher, 829 F.2d 286, 288 (1st

12

Cir. 1987)).  DRB's allegations are therefore pled with the particularity that is required under Rule 9(b).  See Cardinale, 567 F.3d at 13.

Korngold also argues that Counts V-VII should be dismissed because the alleged misrepresentation and concealment occurred before the sale of Washify.  [Dkt. 24 at 17-18].  In particular, he identifies the "honesty and integrity" policy which DRB cites and explains it did not apply to him until after the parties' agreement was entered and his employment commenced. [Id.].  Be that as it may, DRB in its claims cites statements within the EPA itself that Korngold agreed to despite knowing they were false.  [Dkt. 16 at ¶¶ 22-24, 50-51].  If the facts DRB alleges are true, which the Court at this stage must assume they are, then Korngold's misrepresentations were contemporaneous with, and part of the enactment of, the EPA agreement.  The fact that Korngold was not yet bound by the subsequent employment agreement may be relevant for other claims, but it does not preclude DRB's fraud claims here from moving forward.

Korngold next argues that DRB's fraud claims should be barred because the EPA sets forth mandatory provisions for how disputes between the parties will be resolved.  [Dkt. 24 at 18-19].  Those provisions include a waiver of trial by jury and a clause that identifies an indemnification process as the sole remedy available to the parties.  [EPA at § 8.10, 7.09].  This argument fails for two reasons.  First, the explicit terms of the indemnification clause, which the contract otherwise identifies as the "sole and exclusive" dispute resolution mechanism, includes an exemption for claims brought by the parties "based on fraud."  [Id. at § 7.09].  Second, Korngold cannot seek to enforce specific provisions in the contract because DRB, by alleging fraud, is challenging the validity of the contract itself.  Fraud claims, particularly those concerning the formation of the contract, "cannot be categorized as . . . involving the rights or

obligations under the contract." ACI Worldwide Corp. v. KeyBank Nat'l. Ass'n., 2020 WL 1025418, at *5 (D. Mass. Feb. 28, 2020) (declining to enforce choice of law provision where fraud was alleged in the inducement of the contract). DRB has asserted that it is entitled to void the Washify acquisition and it is black letter law that fraud is a basis for a contract's rescission. Restatement Second of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient"); NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d 162, 169 (D. Mass. 2010) ("Massachusetts law follows the Restatement's model for fraud in the inducement … "); Howe v. Palmer, 956 N.E.2d 249, 253 (Mass. App. 2011) (describing fraud as a basis for avoiding obligations in the contract); [Dkt. 16 at ¶ 113].

### b. Chapter 93A claim (Count VIII)

DRB brings a separate counterclaim under Mass. Gen. Laws ch. 93A ("Chapter 93A") alleging that Korngold's conduct, and his failure to disclose material information, amount to "unfair and deceptive acts or practices in the conduct of trade or commerce." [Dkt. 16 at ¶¶ 99-106]. Korngold claims that the Chapter 93A claim should be dismissed because it arises out of Korngold's employment relationship with DRB, and agreements between employee and employer do not amount to "trade" or "commerce" and are thus not covered by the statute. [Dkt. 24 at 19]. Korngold's argument fails, however, because the thrust of DRB's claim focuses on Korngold's concealment of key facts in the lead-up to Washify's purchase—their subsequent employee/employer relationship is therefore not the primary basis giving rise to the Chapter 93A claim. [Dkt. 16 at ¶¶ 99-106].

Chapter 93A covers "trade" and "commerce" which it defines to include "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of ... any security" with "security" "defined broadly under Massachusetts law to include any stock." Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 760 (1st Cir. 1997) (quoting Mass. Gen. Laws ch. 93A, § 1(b); ch. 110A, § 401(k)). DRB's purchase of Washify, and Korngold's alleged conduct in relation to that purchase, falls into that definition. Accordingly, the motion to dismiss DRB's Chapter 93A counterclaim is denied.

### c. Section 410 claim (Count IX)

DRB brings a counterclaim under Mass. Gen. Laws ch. 110A, § 410 (a)(2) ("Section 410") for making untrue statements of material fact or omissions during its sale of securities to DRB as part of the Washify acquisition. [Dkt. 16 at ¶¶ 108-113]. Korngold argues that the Section 410 claim should be dismissed because he never made an affirmative statement about the Pay Stations being certified for outdoor use and he had no legal duty to do so. [Dkt. 24 at 20-21]. He further argues that the relief DRB seeks under Section 410 is impermissible because DRB has not alleged that it sold Washify stock at a loss or that it was prepared to sell the stock back to Korngold and the other sellers. [Id.].

Under Section 410, DRB must show the following: 1) Korngold offered or sold securities in Massachusetts; (2) by making any untrue statement of, or omitting, any material fact; (3) DRB did not know of the untruth or omission; and (4) Korngold knew or should have known of the untruth or omission. Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1026 (Mass. 2004). Under Section 410, DRB does not need to prove either negligence or scienter. Id.

Whether a misstatement or omission is "material" depends on whether there is a "substantial likelihood that the omitted information would have significantly altered the 'total

15

mix' of information available to the ordinary reasonable investor." Welch v. Barach, 993 N.E.2d 742, 748 (Mass. App. 2013) (internal quotations omitted). That misstated or omitted fact must have been important to a reasonable investor, but it does not need to have been casually or decisively important to the investment decision. Id.

At this stage, DRB has plausibly plead that Korngold's omissions, regarding the outdoor capability of Washify's Pay Stations and the customs duties Washify owed, had a material impact on the Washify acquisition. This is supported by DRB's claim that those omissions resulted in DRB overvaluing the purchase price of Washify and undervaluing the expenses it incurred from the acquisition. [Dkt. 16 at ¶¶ 19, 25]. Korngold asserts that there was no requirement, no expectation, and thus no misrepresentation that the Pay Stations be certified for outdoor use in the first place. [Dkt. 24 at 20-21]. Whether that is the case, however, can be better be assessed after the parties have completed discovery. DRB has met its burden at this stage.

The Court also disagrees with Korngold's assertion that DRB failed to adequately allege damages for its Section 410 claim. A violation of Section 410 can be remedied either by "returning the buyer to the status quo through recission, or if recission is unavailable, to equivalent damages." In re Access Cardiosystems, Inc., 776 F.3d 30, 33 (1st Cir. 2015). Contract damages, punitive damages, multiple damages, and injunctive relief however are precluded. In re Access Cardiosystems, Inc., 488 B.R. 1, 8 (D. Mass. 2012). DRB asserts that it is entitled to void the Washify acquisition and it also seeks damages. [Dkt. 16 at ¶¶ 112-13]. Both of these remedies are authorized by the statute, even if DRB may only be entitled to one or the other if its claims are successful. At this stage of the proceedings, however, DRB's request for relief is sufficient to allow its claim to proceed.


### d. Breach of EPA claims (Counts III and IV)

While the above-described counterclaims of DRB survive, DRB's claims based on breach of the EPA do not. This is because, assuming the agreement was proper, DRB waived its breach claims and was also not in compliance with its own obligations under the EPA.

DRB alleges that Korngold breached his obligations under the EPA because of the underreporting of import duties and mislabeling of Pay Stations (Count III) and for misrepresenting ownership of software and hardware (Count IV). [Id. at ¶¶ at 65-80]. Korngold asserts that these claims should be dismissed because the EPA contained an express waiver for such claims. [Dkt. 24 at 6-7]. The EPA identifies indemnification as the "sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation." [Dkt. 24 at 7; EPA at § 7.09]. Korngold highlights that DRB's allegations contain no assertion that it had attempted to seek out indemnification as per the agreement. [Dkt. 24 at 10]. Korngold advances several other arguments for why DRB's breach of contract claims should be dismissed including: (1) that any alleged misrepresentations made prior to the execution of the contract are excluded due to the EPA's integration clause; (2) that the misrepresentations DRB cites were made by Washify, not Korngold; (3) that the representations and warranties in the EPA did not survive the closing, as they identify DRB's recourse for the claims as the representation and warranty insurance; and (4) that DRB in the EPA expressly acknowledged that Korngold has no liability for misrepresentations of omissions in the information it provided DRB about Washify outside of the representations and warranties in the purchase agreement. [Id. at 8-14].

DRB responds that they planned to seek indemnification, despite considering it futile, and that they will file an amended complaint based on Korngold's failure to indemnify when that

17

occurs. [Dkt. 29 at 12]. DRB further argues that its breach of contract claims should be allowed to proceed so that they can obtain a determination that Korngold breached his obligations and that therefore his "for Cause" termination was proper. [Id. at 14].

Under New York Law, "where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." R/S Associates v. NY Job Dev. Auth., 98 N.Y.2d 29, 32 (N.Y. Ct. App. 2002) (internal quotation omitted). The EPA agreement identifies indemnity as the sole recourse and exclusive remedy available to the parties, including for breach of any representation or warranty. [EPA at §7.09]. Fraud is the only exception to that provision that the agreement outlines. [Id.]. The indemnifications provisions referenced in the remainder of the EPA outline the process by which a buyer, like DRB, could remedy a breach, including for "any breach or non-fulfillment" of the sellers commitments under the EPA. [Id. at § 7.01]. One requirement of that process is that the party seeking indemnification must serve a written notice within 12 months of the closing date. [Id. at § 7.03(a)].

The relief DRB seeks here concerns representations that were made to it by Korngold during its acquirement of Washify and additional costs it incurred based on its reliance on those representations, including for the payment of pre-closing tax liabilities. [Dkt. 16 at ¶¶ 66-68, 76-80]. This type of conduct was covered by the agreement the parties entered into which, by its plain terms, identified indemnification as the sole remedy for the breach of any representation or agreement made by a party. [EPA at §7.09]. DRB's articulation of its counterclaim against Korngold for breach of contract with respect to the EPA does not address the indemnification provision or any efforts to comply with it. [See Dkt. 16 at ¶¶ 66-73, 75-80]. DRB makes no allegation that it attempted to provide Korngold written notice, as it agreed to do, over any breach it felt entitled to indemnification. [See id.]. Absent that, DRB's counterclaim does not

demonstrate that it attempted to comply with its own obligations in response to Korngold's actions. [See id.]. As such, DRB does not assert a plausible claim for breach of the EPA.

DRB's assertion that it plans to seek indemnification but thinks it is futile is not sufficient to salvage their claim. None of these factual allegations were made in the counterclaim itself. [See Dkt. 16 at ¶¶ 66-73, 75-80]. Factual assertions made outside the complaint and which have not been incorporated by reference in the complaint, such as those made in DRB's opposition, are not appropriate for the Court to consider here. See Trans-Spec Truck Serv., 524 F.3d at 321.

DRB's second argument, that the maintenance of their breach of the EPA claims will enable the Court to determine whether DRB's termination "for Cause" was proper, similarly fails. [Dkt. 29 at 13-14]. The threshold question of whether Korngold was terminated for cause will already be addressed by the Court when it resolves Korngold's own breach of contract claims, as both Count I and Count II of Korngold's complaint assert that he was terminated by DRB without cause. [Dkt. 1 at ¶¶ 47-55]. Maintaining DRB's insufficient breach of contract claims to resolve separate questions about Korngold's termination is therefore unnecessary.

Since the Court has determined that DRB has not sufficiently pled its breach of contract counter-claims (Counts III and IV) based on the indemnification clause the parties agreed to, it need not address Korngold's additional arguments at this time about the assertions being made by Washify and not himself, the integration clause excluding misrepresentations made prior to its execution, the representations and warranties not surviving the closing, and DRB's acknowledgement that Korngold has no liability for misrepresentations or omissions in the information it provided DRB about Washify.

**IV.     CONCLUSION**

For the foregoing reasons, Korngold's motion to dismiss DRB's counterclaims [Dkt. 21] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Counts III and IV and **DENIED** as to Counts V-IX.

**SO ORDERED.**

Dated: June 23, 2023 /s/ Angel Kelley
Hon. Angel Kelley
United States District Judge